## RAMSEY et al. v. MARLIN FIREARMS CORPORATION.

(District Court, D. Connecticut. July 13, 1925.)

No. 1660.

Receivers ⬦⟾77(4)—Collections made by receivers on accounts assigned as security held to belong to assignee.

A business corporation obtained advances from a credit company, to which it assigned accounts receivable, in effect as security for the advances and an agreed compensation. It was authorized by the contract to collect the accounts, but was required to remit the checks and drafts as received to the credit company, making it merely a collection agent. Receivers were appointed for the corporation, who collected certain of the accounts and mingled the proceeds with their other funds. Held, that the legal title to such proceeds was in the credit company, which had a lien on the commingled fund for the amount of its advances and the stipulated compensation, not exceeding the amount of the collections.

In Equity. Suit by George Ramsey and others against the Marlin Firearms Corporation. On petition of receivers for an order requiring the Commercial Credit Company to pay over $2,636.40, collected on accounts due defendant. Petition denied, and decree for Credit Company on cross-claim.

Leo Oppenheimer and Howard O. Pierson, both of New York City, for Commercial Credit Co.

Louis H. Strouse, of New York City, for receiver.

THOMAS, District Judge. In an action to conserve the assets of the defendant corporation, receivers were appointed and are now functioning, and they now ask for instructions in the form of a petition for an order to direct the Commercial Credit Company to pay over to the receivers the sum of $2,636.40, which amount was collected from the Shapleigh Hardware Company and is now held by the Credit Company.

Prior to the commencement of the action, the defendant corporation had entered into a written contract with the Commercial Credit Company, a copy of which is attached to the petition, certain provisions of which will be discussed hereinafter. Pursuant to the terms of this contract, the defendant corporation had assigned a number of its accounts receivable to the Commercial Credit Company and received certain sums of money upon said assignments. These assigned accounts, however, were not collected by the Commercal Credit Company, but were collected by the receivers, who thereupon, from time to time, remitted to the Commercial Credit Company the sums theretofore paid by the Commercial Credit Company, so that the full amount was eventually paid. During the receivership, certain sums were also collected from the Shapleigh Hardware Company, which were made up of two items, one an account which had theretofore been assigned to the Commercial Credit Company, and another an account which had been created by the receivers themselves. This money was collected by the Credit Company, which claims that there is still money due it from the receivers. The receivers, on the other hand, claim that they are entitled to the money collected by the Credit Company and owe that company nothing.

The contract between the Marlin Company and the Credit Company was executed September 11, 1922. The language of this contract is far from simple. Its tortuous indirection and its misleading nomenclature makes it somewhat difficult to ascertain the exact nature of the obligations of the parties. In paragraph "first" the Credit Company agrees to "buy" acceptable accounts belonging to the Marlin Company, and it agrees to pay 100 per cent. of the gross face value thereof. Nevertheless, this 100 per cent. is really something else. It is to be "less a charge equal to the highest legal contract rate of interest on the money outstanding thereon." Just what this means is not obvious. As the Credit Company is "buying" the account, it is difficult to see or understand on what theory it can be said to have any money "outstanding" thereon. Again, 100 per cent. of the gross value really means only 75 per cent. of the gross value, which is the sum "paid in cash" upon the acceptance of the account. The remaining 25 per cent. is to be paid immediately upon the payment by the debtor of the account itself, less deductions by the debtor and less certain total charges.

The contract then provides that no payments of the remainder need be made as long as any of the accounts are affected by a breach of the warranties contained in the agreement, "but such remainder, and any moneys, accounts, or property of the first party which may come into possession of second party, may be held and later applied to the payment of any accounts or indebtedness." As the party of the first part is the Marlin Company and the party of the second part is the Credit Company, this reference to the "property of the first party" seems to indicate, after all, that the Credit Company did not "buy" the accounts, but that they

were, in fact, the property of the Marlin Company.

The contract further provides that the Marlin Company may receive remittances of these sold accounts at its own office, the object being to avoid possible loss of trade by reason of it becoming generally known that the Marlin Company had assigned or sold its accounts. The. Credit Company, however, is given the right to terminate this privilege at any time, and the Marlin Company agrees that it will deliver all original drafts, checks, notes, and other evidences of payment, as received, directly to the Credit Company. This clause in the contract apparently constituted the Marlin Company as the agent of the Credit Company for the purposes of collecting the sums due on these accounts.

In the third paragraph of the contract, the Credit Company agrees to perform certain "services" for the Marlin Company. An examination of this clause, however, makes it apparent ·that the rendition of these "services" is to occur only at the request of the Marlin Company. For instance, the Credit Company is to "place its collection department at the disposal of the first party, and upon request endeavor to collect direct from the debtors any accounts purchased hereunder."

By the fourth paragraph of the contract it is agreed that the total "compensation" to be paid the Credit Company for all "services" and other considerations, and for the charges mentioned in the first paragraph, is to be a sum equivalent to $1/25$ of 1 per cent. of the "gross face value of the accounts for each day from the date of purchase by and until paid to the second party, plus $5 per $1,000, only on the first $100,000 of accounts purchased."

As part of this agreement, the Marlin Company warranted that every account "sold" to the Credit Company would be paid in full. There are numerous other provisions, which are not germane to any discussion of the problem presented upon the petition of the receivers and will therefore be omitted.

An examination of the briefs of counsel leads to the conclusion that, whatever else this contract may or may not be, it resulted, at least, in making the Credit Company the holder of the accounts assigned to it, and that the accounts thus assigned constituted at least a security for repayment of the sums advanced by the Credit Company plus the "compensation" agreed upon. In essence, then, this contract constituted a loan from the Credit Company to the Marlin Company upon the security of the accounts assigned to it. The loan was to be repaid by the Marlin Company, plus the agreed compensation for making the loan, which, as stated in the contract, was $1/25$ of 1 per cent. per day upon the gross amount of the outstanding uncollected accounts.

It appears, then, from the stipulation entered into between the parties, that on the 17th day of July, 1923, the day the receivers were appointed, the Credit Company had advanced $55,057.57 against accounts assigned to it in the sum of $72,796.92. These assigned accounts were collected by the receivers, who thereupon commingled the funds with the assets of the estate, but subsequently paid out at various times and in various amounts the full sum advanced. They did not, however, pay the sum of $4,455, constituting the $1/25$ of 1 per cent. per diem charge provided for in the contract. There seems to be no dispute as to the accuracy of the calculation by which this sum is reached.

It is not the province of the court to determine whether this contract was onerous or fair in its provisions. It is sufficient that it was entered into, and all we are here permitted is to determine the exact obligation of each party to it. One twenty-fifth of 1 per cent. per diem, computed, not upon the amount advanced, but upon the total face amount of the outstanding accounts, probably was equal to interest at the rate of over 20 per cent., but the parties solemnly agreed to this arrangement. No question of usury has been raised here, so there is no option left to the court, except to enforce the arrangement, unless some principle of law bars such enforcement.

This much seems obvious. If the Credit Company, instead of permitting the Marlin Company to collect upon these assigned accounts, had proceeded to notify the debtors of the existence of the assignment, and had thereupon made its own collections, then this court could neither deprive the Credit Company of the security assigned to it, nor diminish the extent of that security in any manner. Whether the assignment of the accounts vested in the Credit Company a purchaser's title, or merely a mortgagee's title, it is unnecessary to here decide, because the fact is that in law such an assignment did operate to transfer at least the legal title. Therefore to all moneys collected on these accounts the legal title vested in the Credit Company, and, had it done its own collecting, it is difficult to see upon what theory either the Marlin Company, or its receivers subsequently appointed, could demand from

the Credit Company any sums other than those provided for in the contract pursuant to which assignments were made.

The Credit Company, however, did not do its own collecting. It was done by the Marlin Company, and subsequently by the receivers. It has already been noted that the Marlin Company, in this respect, acted only as the agent of the Credit Company, and as such agent it collected moneys, the title to which inhered in the Credit Company. It had no power of independent disposition over these funds; it was a fiduciary only. In fact, according to the terms of the agreement, it could not even deposit the checks, drafts, or other evidences of debt received on these accounts in its own account, but was required to forward such instruments at once to the Credit Company. Such collections, therefore, as it did make, were collections made in law by the Credit Company itself, and these funds were funds belonging to the Credit Company.

The appointment of receivers in this action did not operate to divest the Credit Company of its title to these accounts. Therefore, when the receivers collected moneys on these accounts, they were collecting money the legal title to which inhered in the Credit Company. When they commingled these funds with the general assets of the estate, they were actually commingling trust funds, and thereby subjecting the general assets of the estate to a lien in favor of the trust.

Nothing appears upon the face of the stipulation from which I can deduce that, not only was the $55,057.57 advanced by the Credit Company collected, but that out of these assigned accounts there was also collected a sum sufficient to pay the $4,455 "service" charges. However, I shall assume that such was actually the fact, and the order to be entered upon this opinion is subject to a motion to vacate, in the event that this assumption is incorrect. As the full amount of the moneys advanced by the Credit Company, including "service" charges thereon, has actually been collected out of the accounts assigned to the Credit Company, I hold that this entire sum must be paid by the receivers to the Credit Company.

From this disposition of the matter it follows that the funds already placed in the hands of the Credit Company by way of the Shapleigh collection need not be returned by the Credit Company to the receivers. As against the claim of the receivers for this amount, the Credit Company had a valid set-off of $4,455—funds which constituted a lien upon the general body of assets. The receivers are also directed to pay the difference between the amount held by the Credit Company on the Shapleigh collection and the sum of $4,455.

Decree accordingly.